Nick SOTELL, Plaintiff-Appellant,

v.

MARITIME OVERSEAS INC., and Ocean Transportation Co., Inc., Defendants-Appellees.

OCEAN TRANSPORTATION COMPANY INCORPORATED, Defendant and Third Party Plaintiff-Appellant,

v.

WESTINGHOUSE ELECTRIC CORP., and New York Shipbuilding Corp., Third Party Defendants-Appellees.

Nos. 394, 478, Dockets 35036, 34986.

United States Court of Appeals, Second Circuit.

Argued Jan. 29, 1973.

Decided Feb. 26, 1973.

Ned R. Phillips, New York City (Abraham E. Freedman, New York City, on the brief), for plaintiff-appellant.

William P. Kain, Jr., New York City (Haight, Gardner, Poor & Havens, Hollis M. Walker, Jr., and Richard A. Corwin, New York City, on the brief), for defendants-appellees and defendant and third party plaintiff-appellant.

Before ANDERSON, FEINBERG and MULLIGAN, Circuit Judges.

ROBERT P. ANDERSON, Circuit Judge:

Nick Sotell, a sixty-five year old seaman with over forty years of sailing experience, was serving as Second Assistant Engineer aboard the t/s *Ocean Ulla,* owned and managed respectively by the defendants Ocean Transportation Co. and Maritime Overseas, Inc. (shipowner), when, on October 4, 1965, a turbine explosion in the port forced draft blower ripped loose pieces of asbestos insulation which injured him. He brought this action against the shipowner under the Jones Act, 46 U.S.C. § 688, and for unseaworthiness. The shipowner brought a third-party action against Westinghouse Electric Corporation, the manufacturer of the turbine, and New York Shipbuilding Corporation, the builder of the *Ocean Ulla.* In the primary action the jury found in favor of the shipowner; and the third-party action, tried to the court alone, was dismissed without prejudice.

At the trial, Sotell testified that as part of his job in helping to secure the port boiler for its annual cleaning, he was ordered by the Chief Engineer to shut down the port forced draft blower which was located in the fidley, the highest level of the engine room. As he reached the blower, he testified that the turbine was going "like a jet," vibrating, and throwing asbestos lagging, and that he tried to stop it with the emergency "over speed trip." When this attempt failed, however, he began to close the steam intake valve, but, before he could take more than several turns on it, the blower exploded and he was hit in the head by some asbestos pieces which knocked him "out for a few minutes." He then got up, finished closing the intake valve, and moved to the other side of the blower to close the exhaust valve when the Chief Engineer arrived.

The only other witness on the liability issue, Chief Engineer Macon Rowse, testified that he was about forty feet below the fidley when he heard an explosion. After he started up the ladder to investigate, he heard a sound like a tube being deflated and noticed that the back pressure gage was falling. When Rowse reached the blower, within thirty seconds after the explosion, Sotell was at the exhaust valve and, without being asked, said to Rowse, "I didn't touch them, Chief, I didn't touch them."

The Chief Engineer testified that Sotell, contrary to proper operating procedure, must have closed the exhaust valve before closing the intake or supply valve, and that after the explosion, he had reopened the exhaust valve. This· explained the noise of deflation, accompanied by the drop in the back pressure line *after* the explosion, because, if the exhaust valve had been opened at the time of the explosion, the back pressure would have dropped immediately.

Additional testimony was developed at the trial to the effect that the port forced draft blower had been in good condition before the explosion and that all of its parts were in good working order afterwards, except that its casing was split open. Furthermore, Sotell admitted that he had not read the instruction book for operating this machinery, and he had not previously closed down this blower or worked with similar equipment for a number of years. Sotell also testified at trial that the intake valve was very low and that he bent down to turn it, but he had testified at the taking of his deposition that he could reach it standing up. Actually it is undisputed that the exhaust valve was at a higher level than the intake valve.

■ The appellant claims that he was entitled to a directed verdict or a judgment notwithstanding the verdict or, at the very least a new trial. If the only evidence in the case was the undisputed fact that the plaintiff was injured by an explosion of unknown origin, then he probably would have been entitled to a verdict, Oliveras v. American Export Isbrandtsen Lines, Inc., 431 F.2d 814 (2 Cir. 1970); Van Carpals v. The S.S. American Harvester, 297 F.2d 9 (2 Cir. 1961), cert. denied, 369 U.S. 865, 82 S. Ct. 1031, 8 L.Ed.2d 84 (1962); Sprague v. The Texas Co., 250 F.2d 123 (2 Cir. 1957). Here, however, the defendant produced evidence which supported a finding that the plaintiff's negligent actions alone were the cause of the explosion; and the court correctly charged, without objection, that the plaintiff could not recover if his negligence was the sole cause of the accident, Pisano v. The S. S. Benny Skou, 346 F.2d 993 (2 Cir.), cert. denied, 382 U.S. 938, 86 S.Ct. 389, 15 L.Ed.2d 349 (1965); Dixon v. United States, 219 F.2d 10, 16–17 (2 Cir. 1955); Donovan v. Esso Shipping Co., 259 F.2d 65, 67 (3 Cir. 1958), cert. denied, 359 U.S. 907, 79 S.Ct. 583, 3 L. Ed.2d 572 (1959); cf., Usner v. Luckenbach Overseas Corp., 400 U.S. 494, 500, 91 S.Ct. 514, 27 L.Ed.2d 562 (1971).

■ The appellant argues, however, that he was entitled to a directed verdict or judgment n. o. v. on the ground that the defendant failed to produce sufficient evidence that he did anything wrong, or, that if he did, that it was a proximate cause of the explosion. In order to prevail in this argument, however, he must show either that there was no evidence on the point or that the evidence, when viewed in the light most favorable to the appellee, would be such that reasonable men could not find for the defendant, Fortunato v. Ford Motor Co., 464 F.2d 962, 965 (2 Cir.), cert. denied, 409 U.S. 1038, 93 S.Ct. 517, 34 L. Ed.2d 487 (1972); Compton v. Luckenbach Overseas Corp., 425 F.2d 1130, 1132 (2 Cir.), cert. denied, 400 U.S. 916,

91 S.Ct. 175, 27 L.Ed.2d 155 (1970); Armstrong v. Commerce Tankers Corp., 423 F.2d 957, 959 (2 Cir.), cert. denied, 400 U.S. 833, 91 S.Ct. 67, 27 L.Ed.2d 65 (1970).

There was certainly ample evidence based upon the Chief Engineer's testimony and certain inconsistencies in Sotell's for the jury to conclude that the plaintiff made the mistake of closing the exhaust valve before shutting off the intake valve. Furthermore, the jury was warranted in deciding that such action was the sole cause of the explosion. While it is true that no witness specifically stated, in haec verba, that closing of the valves in the wrong order would cause an explosion, there was abundant testimony from both Rowse and Sotell that steam driven equipment must always be closed down by first shutting off the intake valve and secondly closing the exhaust valve. It was a fair inference, then, for the jury to conclude, based upon their common sense, that Sotell's actions caused a steam pressure build-up sufficient to create the explosion, Salem v. United States Lines Co., 370 U.S. 31, 35, 82 S.Ct. 1119, 8 L.Ed.2d 313 (1962); Schulz v. Pennsylvania R. Co., 350 U.S. 523, 526, 76 S.Ct. 608, 100 L.Ed. 668 (1956); see also, Sentilles v. Inter-Caribbean Shipping Corp., 361 U. S. 107, 109, 80 S.Ct. 173, 4 L.Ed.2d 142 (1959).

■ The trial court, after due deliberation, denied the appellant's motion for a new trial based upon the weight of the evidence. This motion is addressed to the discretion of the trial court, and we find no reason to upset his determination, Oliveras, supra, 431 F.2d at 817; Compton, supra.

■ The appellant also claims error in several of the trial court's rulings concerning the admissibility of evidence. He first contends that it was wrong for the court to sustain an objection to his cross-examination of Chief Engineer Rowse in regard to the absence of a

spring-loaded exhaust valve on the port blower.[1]

While it is true that the absence of such a valve might have been probative on the issue of seaworthiness, the objection to plaintiff's counsel's particular question was properly sustained. Counsel had asked if the turbine had a back pressure trip to which Rowse replied in the negative but acknowledged that it was a safety device, and he further testified that the turbine had no spring-loaded exhaust valve. Plaintiff's counsel's next question was whether this, too, was a safety device, but defense counsel interposed an objection, which the court sustained. Plaintiff's appeal from this ruling is not well taken because even if the spring-loaded exhaust valve was "a safety device," such a fact was irrelevant until there was sufficient testimony, by way of foundation, to indicate that such a valve was required in order to make the vessel "reasonably suitable for her intended service," Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 550, 80 S.Ct. 926, 933, 4 L.Ed.2d 941 (1960). But there was no testimony that a spring-loaded valve was needed, nor did counsel attempt to ask Rowse whether or not he thought one was needed.

On appeal Sotell makes much of the fact that the shipowner in its third-party action against the shipbuilder attempted to show that the specifications for the ship called for a certain type of valve on the port blower which was not installed. But even if we could consider testimony from that action in regard to the primary case, it would make no difference, because there was no testimony on the point; there was nothing more than counsel's arguments that the valve called for in the plans would have prevented the accident. Moreover, there was no proof that such a valve was needed in order to make the ship reasonably fit.

▮ The appellant also claims error in the admission into evidence of a Coast Guard Certificate of Inspection and an American Bureau of Shipping report based on examinations of the t/s *Ocean Ulla* while she was in dry dock during December, 1964. Sotell argues that these agencies' approval of the condition of the vessel was irrelevant because the inspections, as shown on the face of the reports, did not include a detailed examination of the port forced draft blower. Chief Engineer Rowse, however, testified that both the Coast Guard and the American Bureau of Shipping checked all the equipment, including the turbine fan blowers; therefore, there was no error in the admission of the inspection reports.

The judgment in favor of the defendants against the plaintiff is affirmed, and in light of this, the judgment dismissing the shipowner's third-party action without prejudice is also affirmed.

---

1. The pertinent testimony was as follows:

"Q. Did this turbine have a back pressure trip? A. Not a back pressure trip, no.

Q. Do you know what a back pressure trip is? A. Yes.

Q. That is a device which automatically knocks off the turbine if the back pressure builds up; isn't that correct? A. That's correct.

Q. That is what is known as a safety device, isn't it? A. Yes.

Q. Did this turbine have a spring-loaded exhaust valve? A. No.

Q. That also is a safety device which would automatically open the valve if the pressure were to build up inside the turbine, isn't that correct?

Mr. Kain: If your Honor please, I object on the grounds that there is no testimony in this case at this time that there is any requirements that this turbine have a back pressure trip or a spring-loaded exhaust valve.

The Court: Objection sustained."